```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| BERNADETTE MARSELLA, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No. 18-2294 (JBS) |
| COMMISSIONER OF SOCIAL SECURITY, | **OPINION** |
| Defendant. | |

APPEARANCES:

Richard Lowell Frankel, Esq.
BROSS & FRANKEL, PA
725 Kenilworth Avenue
Cherry Hill, NJ 08002
      Attorney for Plaintiff

Roxanne Andrews, Special Assistant U.S. Attorney
SOCIAL SECURITY ADMINISTRATION
OFFICE OF THE GENERAL COUNSEL
300 Spring Garden Street, 6th Floor
Philadelphia, PA 19123
      Attorney for Defendant

**SIMANDLE**, District Judge:

## I.    INTRODUCTION

This matter comes before the Court pursuant to 42 U.S.C §
405(g) for review of the final decision of the Commissioner of the
Social Security Administration ("SSA") denying the application of
Plaintiff Bernadette Marsella ("Plaintiff") for Social Security
Disability Insurance ("SSDI") benefits under Title II of the Social
Security Act, 42 U.S.C. § 401 et seq. Plaintiff, who suffers from
degenerative arthritis, rib dysfunction, chronic pain due to

scoliosis, and other conditions, was denied benefits for the period of disability from November 1, 2010, the alleged onset date of disability, to December 31, 2013, the date Plaintiff was last insured. The Administrative Law Judge ("ALJ") issued a written decision on September 21, 2016.

In the pending appeal, Plaintiff contends that the ALJ's decision must be reversed and remanded on four grounds. To that end, Plaintiff argues that the ALJ erred by: (1) finding Plaintiff's mental health impairments "not severe" and failing to include any limitations related to those impairments in the formulation of Plaintiff's Residual Function Capacity ("RFC"); (2) failing to account for limitations related to Plaintiff's cervical spine impairments, fibromyalgia, costochondritis,[1] and irritable bowel syndrome in the RFC; (3) relying on a vocational expert's testimony without asking the vocational expert whether an individual with Plaintiff's RFC could perform Plaintiff's past relevant work; and (4) failing to properly evaluate and weigh the medical evidence of record, including the opinions of Plaintiff's treating physicians. For the reasons that follow, the Court will affirm the ALJ's decision.

---

[1] "Costochondritis" is commonly understood as "inflammation of the cartilaginous junction between a rib or ribs and sternum." Dorland's Illustrated Medical Dictionary 423 (Elsevier Saunders 32nd ed. 2012).

## II.  BACKGROUND

### A.    Procedural History

Plaintiff protectively filed an application for SSDI benefits on April 4, 2013, alleging a disability from November 1, 2010 through December 31, 2013, the date Plaintiff was last insured (hereinafter, "the Date Last Insured").[2] (R. at 79, 162.) The SSA denied Plaintiff's claim on December 4, 2013. (Id.) Plaintiff's claim was again denied upon reconsideration on April 12, 2014. (R. at 93.) A hearing was held before ALJ Michael S. Hertzig on August 19, 2016. (R. at 36-67.) ALJ Hertzig issued a thorough opinion on September 21, 2016, denying benefits. (R. at 15-31.) On December 14, 2017, the Appeals Counsel denied Plaintiff's request for review. (R. at 1-5.) This appeal timely follows.

### B.    Personal and Medical History

Plaintiff was 56 years old on the alleged disability onset date and 61 years old at the time of her hearing before the ALJ. (R. at 80.) She graduated from high school. (R. at 191.) Plaintiff

---

[2] The SSDI benefits program "is similar to other insurance programs in that, to qualify, a claimant must have coverage, i.e., be fully insured, at the time of disability . . . [and] [t]he coverage period for an individual extends to his date last insured, which is the last day when he is eligible for [SSDI benefits]." Bulger v. Berryhill, 2018 WL 4680267, at *4 (E.D. Pa. Sept. 28, 2018) (citing 42 U.S.C. §§ 423(a),(c); 20 C.F.R. §§ 404.101(a), 404.131(a)). "Under 20 C.F.R. § 404.131, [a claimant] is required to establish that he became disabled **prior to** the expiration of his insured status." Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990) (emphasis added).

worked as a court services officer at the Camden Hall of Justice from 1973 until, after accepting an early retirement package that had been offered to her, she retired on December 1, 2008.[3] (R. at 190, 282, 286.) Plaintiff subsequently received a state pension. (R. at 43.) According to Plaintiff, at the time of her early retirement, she intended to take three years off from work and then return to work on a part-time basis, but she was not able to return to do so due to the onset of her alleged symptoms in November 2010. (R. at 439.)

     1.   Physical Impairments Prior to Date Last Insured

Around November 2010, Plaintiff injured herself while taking several golf lessons. (R. at 44.) According to Plaintiff:

> [R]ight after, possibly the last lesson, I started to experience, like, the upper quad from the top of my leg to the top of my neck . . . . I was having pain and discomfort. And I felt like my skeletal system just wanted to rotate; wanted to twist me from the right to left.

_____

[3] There appears to be some confusion in the Administrative Record between Plaintiff's last day of employment, which was in November of 2008, and her alleged onset disability date, which began in November of 2010. For example, during her hearing before the ALJ, Plaintiff stated, "I last worked the last day of November of 2010" (R. at 40), and told the ALJ that she retired "in 2010." (R. at 43); see also (R. at 181) (in Work History Report, Plaintiff stated that she worked as a court services officer from 1973 through 2010). But Plaintiff's other statements to the SSA (R. at 190), earnings statements (R. at 166-69), and medical records (R. at 282) demonstrate that she retired at the end November 2008, about two years before her alleged onset disability date of November 1, 2010. Thus, the Court has determined that Plaintiff merely misspoke when she testified that she retired in November 2010.

(R. at 44-45.) Thereafter, Plaintiff "resumed normal activity," like landscaping and playing golf until sometime between the spring of 2011 and the beginning of 2012, when her pain "came back with a vengeance." (R. at 45-46.)

Plaintiff started treating with Dr. Julian Maressa, D.O. on July 28, 2011. (R. at 294-95.) Dr. Maressa initially treated Plaintiff for atopic dermatitis (eczema) and called in dicyclomine prescriptions for her. (R. at 294-97.) Plaintiff subsequently underwent testing on October 7, 2011. (R. at 297-301.) On May 21, 2012, Plaintiff returned to Dr. Maressa for stomach issues and acid reflux. (R. at 301-02.)

On May 31, 2012, Plaintiff first complained to Dr. Maressa of shoulder, arm, and rib pain on her right side, which she reported to have been experiencing for four to five weeks. (R. at 302.) Dr. Maressa diagnosed Plaintiff with right flank pain, osteoarthritis, female stress incontinence, and irritable bowel syndrome, and advised her to follow up in two months. (R. at 302-04.) Because Plaintiff had been experiencing bloating and soreness, Dr. Maressa also ordered her to undergo laboratory testing and a CT scan of her abdomen and pelvis, which revealed normal findings. (R. at 305-07.)

Plaintiff followed up with Dr. Maressa and his partner, Dr. David T. Gigliotti, D.O., on several occasions in June and July 2012, complaining of abdominal pain, gas, and/or bloating, in

addition to pain in her right rib, arm, and shoulder. (R. at 307-19.) These examinations again revealed normal findings (R. at 313), and Dr. Maressa recommended exercise and prescribed baclofen. (R. at 316.)

On August 9, 2012, Plaintiff visited with Dr. Maressa for complaints of muscle cramps, back pain, stiffness, and arthritis. (R. at 321.) Dr Maressa observed that Plaintiff had a decreased range of motion at this time and recommended that she continue her current medications (baclofen and nexium) at the prescribed dose and frequency and follow up again in one month. (R. at 321-22.) Around this time, Dr. Maressa also referred Plaintiff to physical therapy and chiropractic care. (R. at 322-28.) According to Plaintiff, this physical therapy "was a total waste of time" and, after three months, she stopped attending. (R. at 46-47.) She also testified that the first chiropractor Dr. Maressa referred her to, Bill Nicoletta, was not able to help. (R. at 48.)

In mid-December of 2012, Dr. Maressa reported that, although physical therapy and chiropractic care had not provided relief, non-steroid anti-inflammatory drugs ("NSAIDS") and muscle relaxers had improved Plaintiff's back pain and numbness and weakness in her neck and entire back. (R. at 329-30.) Dr. Maressa also ordered laboratory tests to rule out autoimmune disorders, recommended continued exercise, and continued baclofen and naproxen. (R. at 330.) Shortly thereafter, Dr. Gigliotti added Ultracet to

Plaintiff's medication regimen for her complaints about pain. (R. at 338.) Dr. Gigliotti noted that Plaintiff reported ongoing "all over body pain-nerve issues" of two-year duration that was likely musculoskeletal in nature and he administrated a trigger point injection for muscle spasms. (R. at 339.)

In January 2013, Plaintiff began chiropractic treatment with Dr. Stanley Pitlin, D.C. (R. at 241.) Dr. Pitlin diagnosed Plaintiff with idiopathic scoliosis of the thoracic disc, thoracic myofascial pain syndrome, and cervicalgia. (R. at 242.) Plaintiff treated with Dr. Pitlin twice every week through May 2013. (R. at 243-67.)

Plaintiff met with Dr. Gigliotti and Dr. Maressa several times between January and May of 2013. (R. at 343-82.) On January 9, 2013, Dr. Gigliotti noted Plaintiff's definite right-sided hypertonicity and myofascial drag and added calcium-magnesium to her medication regimen. (R. at 343-44.) On a later visit, Plaintiff reported slight improvement due to chiropractic care, but also reported ride-side complaints and sensations all over her body. (R. at 346.) On March 5, 2013, Dr. Gigliotti prescribed Plaintiff Cymbalta for fibromyalgia, notwithstanding that the condition was described as "improved." (R. at 356-57.) Later that month, Dr. Gigliotti reported that Plaintiff's myofascial pain syndrome was improved even though Plaintiff had not started taking Cymbalta because she did not want to take that medicine until the

fibromyalgia diagnosis was confirmed. (R. at 360-61.) On April 16, 2013, Plaintiff reported "pain all over body," burning, stiffness, and loss of strength one day after a chiropractic visit. (R. at 368.) Dr. Maressa prescribed Tramadol after examination revealed joint tenderness, decreased range of motion, "arthritic changes," and "right shoulder girdle symptoms." (R. at 369.) Plaintiff again exhibited "arthritic changes" and decreased range of motion on two visits in May 2013, and Dr. Maressa recommended acupuncture and more physical therapy at this time. (R. at 374-79.)

On May 20, 2013, Dr. Daniel J. Ragone, Jr., M.D., P.A., examined Plaintiff and noted Plaintiff's right shoulder pain radiating into her ribs, as well as burning and tingling sensations in her right arm. (R. at 459.) Dr. Ragone also noted scattered trigger points and taut muscle bands and somatic dysfunction (ERS) at right greater than left C5-C7, T4-T8, and L3-L5. (R. at 460.) Based on his findings, Dr. Ragone recommended a TENS unit, trigger point injections, and acupuncture, and prescribed Plaintiff Neurontin for her neuropathic pain. (R. at 461.)

On May 30, 2013, Plaintiff started treating at Cross Keys Physical Therapy, where she continued to treat until November 2015. (R. at 676-712.) On July 23, 2013, Dr. David B. Anselmo, PT of Cross Keys Physical Therapy, informed Dr. Maressa that Plaintiff still had pain and stiffness but could move better. (R. at 680.) In October 2013, Plaintiff told her physical therapist that she

had 5% less pain and limitations in her daily activities (R. at 686) and, by December 2013, Plaintiff reported that she had 75% less pain and limitations since beginning therapy. (R. at 689.)

On October 23, 2013, Plaintiff underwent a consultative orthopedic examination with Dr. Paul DiLorenzo, M.D. (R. at 286-90.) Dr. DiLorenzo reported that Plaintiff had normal gait, no difficulty walking, squatting, or rising from squatting; no trigger points or sensory or motor loss in any lower extremity; normal strength and full range of motion; osteoarthritic changes in the shoulders; and decreased cervical range of motion and minimal tenderness, but no trigger points. (R. at 286-87.) He concluded that Plaintiff had age-related degenerative arthritis in her cervical, lumbar, and thoracic spine with no evidence of radiculopathy, trigger points, or other findings consistent with fibromyalgia, and opined that Plaintiff's overall examination was consistent with only "arthritic changes," including in the shoulders. (R. at 287-88.)

On December 12, 2013, Plaintiff visited with Dr. Maressa and reported she "was feeling better, over did it, [and is] now a little worse." (R. at 410.) Examination revealed bilateral leg edema, but Plaintiff had a normal gait and was advised to continue her medications (baclofen, Aleve, calcium-magnesium, and naproxen), do home exercises, and follow up in four weeks. (R. at

412.) This was Plaintiff's last treatment note from before the Date Last Insured.

### 2. Mental Impairments Prior to Date Last Insured

Plaintiff first treated for anxiety and depression with Dr. Steven Reed, Ph.D. on April 18, 2013. (R. at 276.) Plaintiff met with Dr. Reed again on May 31, 2013 (id.), and on June 12, 2013, Dr. Reed completed a Social Security Disability Psychiatric Report. (R. at 275-81.) In the Psychiatric Report, Dr. Reed noted that Plaintiff had never sought psychiatric services of any kind before presenting to him in April 2013 and he diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood. (R. at 276.) Dr. Reed reported that, "[w]hile there appear to be no limitations on [Plaintiff's] mental capacity for work-related activities, it is my understanding that this is irrelevant in this [Plaintiff's] case. Her primary concern is her physical condition" (R. at 279) and "[t]here appear to be no limitations **psychiatrically** on [Plaintiff's] ability to carry out activities of daily living. As noted on previous pages, however, her primary concern is her **physical** condition." (R. at 280) (emphasis in original). In other words, Dr. Reed concluded that Plaintiff had no mental limitations that would impede work.

At the request of the State of New Jersey Department of Labor and Workforce Development Division of Disability Determination Services ("DDS"), Dr. Lewis A. Lazarus, Ph.D., examined Plaintiff

on October 18, 2013. (R. at 282-85.) Plaintiff reported to Dr. Lazarus that she had been seeing Dr. Reed twice per month for the past seven months, on referral from her primary care because of depression and anxiety. (R. at 282.) According to Dr. Lazarus, Plaintiff "noted prominent depressive symptoms including feeling dysphoric and sad most days with occasional crying spells, having diminished self-esteem, feelings of hopelessness and some feelings of worthlessness," but she denied any recurrent thoughts of death or suicide. (R. at 283.) Dr. Lazarus observed that, upon examination, Plaintiff was fully alert and oriented, and she reported being independent in all activities of daily living, including preparing meals and cleaning, with occasional help from family and friends. (Id.) Dr. Lazarus concluded that "[Plaintiff] indicated she voluntarily retired because of a situation at work but was not necessarily having difficulties in her job" and ultimately recommended that she continue individual supportive counseling as was reportedly being provided. (R. at 284.)

### 3.   Dr. Reed's 2014 and 2016 Letters

In a letter dated March 9, 2014, Dr. Reed provided an update to the SSA, wherein he stated that "[l]ittle has changed since May, 2013" except that "[h]er depressive symptoms have worsened, to some degree." (R. at 422.) For these reasons, Dr. Reed changed his diagnosis of adjustment disorder with mixed anxious and depressive symptoms to a diagnosis of depressive disorder, not

otherwise specified. (Id.) Dr. Reed further noted that Plaintiff "remains fully functional, psychiatrically and cognitively" and "[w]hile she finds her current circumstances distressing and depressing, there have been no significant declines in her adaptive functioning." (Id.) Dr. Reed did not provide any treatment notes. (Id.)

On August 17, 2016, Dr. Reed prepared another letter on Plaintiff's behalf. (R. at 492.) Dr. Reed indicated that, since March 9, 2014, Plaintiff had continued to visit with him about once every three weeks and her diagnosis remained unchanged. (Id.) According to Dr. Reed, "[w]hile the severity of the symptoms has fluctuated from session to session, Ms. Marsella remains clinically depressed and anxious." (Id.) Dr. Reed further noted that, "[a]s was the case in 2013 and 2014, her anxious and depressive [symptoms] are painful emotionally and further erode her quality of life on a daily basis." (Id.) Again, Dr. Reed did not provide any treatment notes.

### 4. Dr. Maressa's June 2014 Medical Source Statement

On June 26, 2014, Dr. Maressa completed a Medical Source Statement on Plaintiff's behalf. (R. at 425-35.) Dr. Maressa diagnosed Plaintiff with somatic dysfunction of the right thoracic spine, right shoulder pain, cervical pain, and scoliosis, and indicated that Plaintiff had substantial physical limitations. (R. at 425.) Dr. Maressa opined that Plaintiff could only walk one to

three city blocks without rest or severe pain, could sit for less than two hours in an eight-hour workday, could stand/walk for up to one hour in an eight-hour workday, and could frequently lift and carry less than ten pounds occasionally, but never lift and carry any weight above ten pounds. (R. at 428.) According to Dr. Maressa, during an eight-hour workday, Plaintiff would be frequently limited in looking down and turning her head right or left, and occasionally limited in looking up or holding her head in a static position. (R. at 432.) Dr. Maressa further opined that the side effects of Plaintiff's medications, including muscle relaxants and NSAIDs, would significantly affect her ability to perform work duties, and that Plaintiff's pain would be severe enough to interfere with the concentration and attention required to perform simple work tasks for 25% or more of a typical work day. (R. at 426.) Dr. Maressa stated that Plaintiff's limitations existed at least since April 2012. (R. at 434.)

### 5.  Dr. Knod's August 2015 Examination

On August 24, 2015, about 20 months after her last insured date, Plaintiff underwent a Comprehensive Independent Medical Examination with George A. Knod, D.O. (R. at 436-452.) In preparation for this examination, Dr. Knod performed a thorough review of Plaintiff's medical records, including imaging studies, treatment notes, and consultative examination reports. (R. at 437-38.) Dr. Knod noted that Plaintiff stated her pain was aggravated

by standing in position for up to a half hour, any bending, walking farther than one block, lifting greater than six pounds, and squatting, and further noted that her physical therapy merely "calms it." (R. at 438.) On examination, Dr. Knod found balance deficits that prevented Plaintiff from heel-to-toe walking or squatting and positive Tinel's sign at the carpal tunnel of the right wrist, degenerative changes in the bilaterally PIP joints, and diminished grip strength. (R. at 442-43.)

Dr. Knod's impression was that Plaintiff had: chronic neck pain due to cervical degenerative disc disease with possible advances cervical spondylosis; chronic mid-back pain due to dextroscoliosis and degenerative disc disease of the thoracic spine; chronic low-back pain with radiographic lumbar degenerative disc disease; restricted range of motion in the right shoulder with suggestion of impingement and osteoarthritic changes; myofascial pain syndrome with diffuse muscle spasm and trigger points on examination; degenerative arthritis in the bilateral hands; and a mental health history consistent with adjustment disorder with anxiety and depression. (R. at 443.) He opined that this "multitude of problems," taken individually or separately, would limit Plaintiff's ability to work in a competitive environment on a regular, full-time basis. (R. at 444.)

### C. State Agency Consultants

Dr. Isabella M. Rampello, M.D., a State agency medical consultant, reviewed Plaintiff's medical records and assessed her physical residual functional capacity. (R. at 68-78.) Dr. Rampello opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently carry 10 pounds, stand and/or walk (with normal breaks) for six hours in an eight-hour workday, could sit (with normal breaks) for six hours in an eight-hour workday, could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, could never climb ladders, ropes, or scaffolds, and was limited in reaching overhead. (R. at 75-76.) Dr. Seung Park, M.D., another State agency medical consultant, reviewed Plaintiff's medical records and concurred with Dr. Rampello's opinion as to Plaintiff's physical residual functional capacity. (R. at 88-89.)

### D. Plaintiff's Statements and Activities

In an Adult Function Report dated May 21, 2013, Plaintiff indicated that she cannot stay in any position for more than fifteen or twenty minutes before experiencing discomfort and pain, including muscle spasms. (R. at 197.) She also noted that pain and depression affected her sleep, and that she could only sleep on and off for an hour at a time. (R. at 198.) According to Plaintiff, she used a TENS unit for her back pain. (R. at 203.) She stated that she had difficulty with lifting, squatting, walking, sitting,

stair-climbing, using her right arm and hand, bending, standing, reaching, kneeling, and concentration. (R. at 201-02.)

During a hearing held by the ALJ on August 19, 2016, Plaintiff testified that she had experienced pain, starting in her groin area and working its way up into her right shoulder and neck, since somewhere between the spring of 2011 and the beginning of 2012. (R. at 46.) Plaintiff testified that her treating physician, Dr. Maressa, referred her to physical therapy in the spring/summer of 2012, but that it did not provide any relief (R. at 46-47), and further testified that, at the time of the hearing, she continued to attend maintenance physical therapy to the extent that her medical insurance allowed. (R. at 51.)

Regarding her daily activities prior to December 31, 2013, Plaintiff explained that she was limited in her walking and sitting and stated that her pain could only be calmed by lying down and medicating. (R. at 52-53.) According to Plaintiff, she was able to do household chores like vacuuming, laundry, and dishes with help from her friend, and that she went to the gym to do yoga stretches on weeks she did not have physical therapy. (R. at 56.) Plaintiff also testified to mental impairments, including depression, anxiety, and memory and concentration problems, and stated that the more she needed to take medication for her pain, the worse those problems got. (R. at 56-57.)

**E.    Vocational Expert Testimony**

During Plaintiff's hearing in front of the ALJ, the ALJ also heard testimony from Janes Earhart, a vocational expert. (R. at 61-66.) Based on Plaintiff's testimony, the vocational expert described Plaintiff's past work as a court clerk (DOT 243.362-010), which is classified as a sedentary and skilled position at the SVP-6 level. (R. at 66.) The ALJ did not ask the vocational expert any hypothetical questions, including whether a person with Plaintiff's RFC could perform work as a court clerk, which the Court addresses in Section IV.B.3, <u>infra</u>.

**F.    ALJ Decision**

In a written decision dated September 21, 2016, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act at any time between the alleged onset date of disability and the Date Last Insured because, consistent with Plaintiff's age, education, work experience, and RFC, she was capable of performing her past work as a court clerk. (R. at 31.)

At the first stage of the five-step sequential evaluation process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since November 1, 2010 through her date last insured of December 31, 2013. (R. at 18.)

Next, at step two, the ALJ determined that Plaintiff had the following "severe" impairments: degenerative disc disease of the lumbar and cervical spine. (<u>Id.</u>) The ALJ found Plaintiff's alleged

irritable bowel syndrome, costochondritis, and fibromyalgia to be "non-severe" because "the bases of these conditions is not clear from the record" and, "[t]o the extent that these could be considered impairments, the record is insufficient to determine severity, particularly prior to the date last insured." (R. at 18.) The ALJ also found that Plaintiff's medically-determinable mental impairments of depression and anxiety were "non-severe" (R. at 19), as discussed in Section IV.B.1, infra.

At step three, the ALJ concluded that none of Plaintiff's impairments or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, including those set forth in Listings 1.02 and 1.04. (R. at 19-21.)

Between steps three and four, the ALJ determined that through the Date Last Insured, Plaintiff possessed the RFC to perform "light work as defined in 20 C.F.R. § 404.1567(b), to include the full range of sedentary work, except that she could only occasionally perform all postural activities." (R. at 21.) In determining Plaintiff's RFC, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (R. at 21.) Although the ALJ found that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms," she concluded that Plaintiff's statements "concerning

the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. at 23.) In doing so, the ALJ analyzed the medical evidence in the record (including records dating from the alleged onset date through the Date Last Insured, as well as records dating on or after the date last insured) with respect to each of Plaintiff's impairments. (R. at 21-29.)

In crafting the RFC, the ALJ also considered the opinions of various treating physicians and State agency medical consultants. (R. at 30-31.) The ALJ assigned "little weight" to Dr. Maressa's June 2014 opinion that Plaintiff was severely limited and had been since November of 2010 because "[Dr. Maressa's] own treatment notes indicate that [Plaintiff] had varying complaints and that she was helped by [physical therapy]" and because "Dr. Maressa is not a mental health specialist, and in any event, his chart notes do not list any mental health complaints until after the date last insured." (R. at 30) Moreover, "[w]ith the exception of hand/reach limitations, which are not supported by the record," the ALJ gave "great weight" to the opinions of the DDS and State agency consultants "who had access to much of the evidence available for the period from the alleged onset date to the date last insured." (R. at 31.) The ALJ did not explicitly assign any weight to Dr. Knod's August 2015 examination, as discussed in Section IV.B.4, infra.

Based on Plaintiff's RFC and the vocational expert's testimony from the September 2016 hearing, the ALJ found, at step four, that Plaintiff was able to perform her past relevant work as a court clerk. (R. at 31.) Accordingly, the ALJ found that Plaintiff was not under a disability, as defined in the Social Security Act, from March November 1, 2010 through December 31, 2013. (Id.)

## III. STANDARD OF REVIEW

This Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The Court's review is deferential to the Commissioner's decision, and the Court must uphold the Commissioner's factual findings where they are supported by "substantial evidence." 42 U.S.C. § 405(g); see also Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Cunningham v. Comm'r of Soc. Sec., 507 F. App'x 111, 114 (3d Cir. 2012). Substantial evidence is defined as "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 400 (1971); see also Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012) (using the same language as Richardson). Therefore, if the ALJ's findings of fact are supported by substantial evidence, those findings bind the reviewing court, whether or not it would have made the same determination. Fargnoli, 247 F.3d at 38. The Court may not weigh the evidence or substitute its own

conclusions for those of the ALJ. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011). Remand is not required where it would not affect the outcome of the case. Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005).

**IV.  DISCUSSION**

**A.    Legal Standard for Determination of Disability**

In order to establish a disability for the purpose of disability insurance benefits, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." Plummer v. Apfel, 186 F.3d 422, 426 (3d Cir. 1999); 42 U.S.C. § 423(d)(1). A claimant lacks the ability to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Plummer, 186 F.3d at 427–428; 42 U.S.C. § 423(d)(2)(A).

The Commissioner reviews claims of disability in accordance with the sequential five-step process set forth in 20 C.F.R. § 404.1520. In step one, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." 20 C.F.R. § 1520(b). Present engagement in substantial activity precludes an award of disability benefits. See Bowen v. Yuckert,

482 U.S. 137, 140 (1987). In step two, the claimant must demonstrate that the claimant suffers from a "severe impairment." 20 C.F.R. § 1520(c). Impairments lacking sufficient severity render the claimant ineligible for disability benefits. See Plummer, 186 F.3d at 428. Step three requires the Commissioner to compare medical evidence of the claimant's impairment(s) to the list of impairments presumptively severe enough to preclude any gainful activity. 20 C.F.R. § 1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Plummer, 186 F.3d at 428. Between steps three and four, the ALJ determines the claimant's RFC. 20 C.F.R. § 404.1545. Step four requires the ALJ to consider whether, based on his or her RFC, the claimant retains the ability to perform past relevant work. 20 C.F.R. § 1520(e). If the claimant's impairments render the claimant unable to return to the claimant's prior occupation, at step five the ALJ will consider whether the claimant possesses the capability to perform other work existing in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 1520(g), 404.1560(c).

**B.  Analysis**

Plaintiff argues that the ALJ erred by: (1) 1) finding Plaintiff's mental health impairments "not severe" and failing to include any limitations related to those impairments in the

formulation of Plaintiff's RFC; (2) failing to account for limitations related to Plaintiff's cervical spine impairments, fibromyalgia, costochondritis, and irritable bowel syndrome in the RFC; (3) relying on a vocational expert's testimony without asking the vocational expert whether an individual with Plaintiff's RFC could perform Plaintiff's past relevant work; and (4) failing to properly evaluate and weigh the medical evidence of record, including the opinions of Plaintiff's treating physicians. The Court addresses each argument in turn.

1.  <u>Substantial evidence supports the ALJ's treatment of Plaintiff's mental impairments</u>

Plaintiff first avers that the ALJ erred in his treatment of Plaintiff's mental impairments by finding them "non-severe" at step two, and also by failing to include any limitations related to those impairments in formulating Plaintiff's RFC between steps three and four. (Pl.'s Br. at 14-17.) Specifically, Plaintiff argues that the ALJ improperly disregarded the opinions of Dr. Reed and Dr. Lazarus regarding Plaintiff's alleged depression and anxiety. (<u>Id.</u> at 15-16.) To the contrary, the Court finds that substantial evidence supports the ALJ's treatment of Plaintiff's mental impairments.

At step two of the sequential elevation process, the ALJ must "determine whether an individual has a severe medically determinable physical or mental impairment or combination of

impairments that has lasted or can be expected to last for a continuous period of at least 12 months or end in death." SSR 96-3p. For an adult, "[a] severe impairment is one that affects an individual's ability to perform basic work-related activities." Id. "Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981) (internal citation omitted).

Even if the ALJ properly determines that a claimant's impairments are non-severe, however, a finding of non-severity does not eliminate those impairments from consideration of his or her overall ability to perform past work. Indeed, between steps three and four, the ALJ is required to assess **all** of the claimant's impairments - even ones that are not "severe" - in combination, when making the RFC determination. See 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity."). SSR 96-8p is clear about what the ALJ must consider:

> In assessing RFC, the adjudicator **must** consider
> limitations and restrictions imposed by **all** of an
> individual's impairments, even those that are not
> "severe." While a "not severe" impairment(s) standing
> alone may not significantly limit an individual's
> ability to do basic work activities, it may—when
> considered with limitations or restrictions due to other
> impairments—be critical to the outcome of a claim. For
> example, in combination with limitations imposed by an
> individual's other impairments, the limitations due to
> such a "not severe" impairment may prevent an individual
> from performing past relevant work or may narrow the
> range of other work that the individual may still be
> able to do.

SSR 96-8p (emphasis added); see also Soboleski v. Comm'r of Soc. Sec., 2015 WL 6175904, at *2 (D.N.J. Oct. 20, 2015) (explaining that a finding of non-severity "does not obviate the need for a separate analysis of how Plaintiff's impairment affects her RFC"). The ALJ must therefore consider all relevant evidence when determining an individual's RFC. See, e.g., Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001).

Here, the ALJ determined that Plaintiff's depression and anxiety during the period between her alleged onset date and Date Last Insured were "non-severe." (R. at 17-19.) After considering the relevant medical records, the ALJ found "[t]here is no treatment of any kind of record until July of 2011," "[i]n terms of depression, the treatment record to the date last insured includes only the report from Dr. Reed in June of 2013, with no accompanying treatment notes," and "[i]n any event, Dr. Reed clearly indicated that [Plaintiff] had no functional limitations

resulting from a mental impairment." (R. at 18-19.) The ALJ further noted that Dr. Lazarus also found in October of 2013 "no clear limitations resulting from any mental impairment, and he diagnosed only adjustment disorder." (R. at 19.) The ALJ considered Dr. Reed's March 2014 and August 2016 letters indicating that Plaintiff had more significant mental issues, but gave these notes no weight and found the letters did not relate back to the period preceding the Date Last Insured because "there are no accompanying treatment notes and [Plaintiff] did not at that time take any medication for any mental condition." (Id.) The ALJ also concurred with the findings of the State agency consultants that there was insufficient evidence of any severe mental impairment prior to the Date Last Insured. (Id.) Finally, the ALJ considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments known as the "paragraph B" criteria and found that "[b]ecause [Plaintiff's] medically determinable mental impairment caused no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area," here depression and anxiety were "non-severe." (Id.)

The record indicates that Plaintiff did not seek treatment for any mental health issues until April 2013, when she met with Dr. Reed for the first time. (R. at 276.) Dr. Reed subsequently

reported in June 2013 that, "[w]hile there appear to be no limitations on [Plaintiff's] mental capacity for work-related activities, it is my understanding that this is irrelevant in this [Plaintiff's] case. Her primary concern is her physical condition" (R. at 279); see also (R. at 280) ("There appear to be no limitations **psychiatrically** on [Plaintiff's] ability to carry out activities of daily living. As noted on previous pages, however, her primary concern is her **physical** condition.") (emphasis in original). A few months later, Dr. Lazarus examined Plaintiff, reported that she was fully alert, oriented, and remained independent in all activities of daily living, and concluded that:

> The recommendations at this time are for individual supportive counseling to continue as is currently reportedly being provided. [Plaintiff] indicated she voluntarily retired because of a situation at work but was not necessarily having difficulties in her job.

(R. at 284.) Notably, like Dr. Reed, Dr Lazarus did not assess any functional limitations as a result of Plaintiff's mental impairments. (R. at 282-84.) And, as noted by the ALJ, none of Dr. Reed's treating notes are in the record. (R. at 18.) The ALJ fully accounted for Dr. Reed's and Dr. Lazarus's opinions (R. at 18-19) and substantial evidence supports the ALJ's ultimate determination that Plaintiff's depression and anxiety prior to the Date Last Insured were "non-severe."

The ALJ also discussed evidence that post-dated the relevant period (i.e., after the Date Last Insured), namely two letters

prepared by Dr. Reed on March 9, 2014 (R. at 422) and August 16, 2016 (R. at 492), which indicated that Plaintiff's depressive symptoms had worsened to some degree. The Court finds that the ALJ reasonably concluded that "[b]ecause there are no accompanying treatment notes and [Plaintiff] did not at that time take any medication for any mental condition, the undersigned does not find that these two later opinions relate back to the period preceding the date last insured, and they are given no weight in regard to that period." (R. at 19.) In any event, "[e]vidence of an impairment which reached disabling severity after the date last insured or which was exacerbated after this date, cannot be the basis for the determination of entitlement to a period of disability and disability insurance benefits, even though the impairment itself may have existed before [a] plaintiff's insured status expired." Manzo v. Sullivan, 784 F. Supp. 1152, 1156 (D.N.J. 1991) (citing Arnone v. Bowen, 882 F.2d 34, 37-38 (2d Cir. 1989); see also DeNafo v. Finch, 436 F.2d 737, 739 (3d Cir. 1971).

Accordingly, and for the reasons described above, the Court finds that substantial evidence supports the ALJ's determination that, prior to the Date Last Insured, Plaintiff's depression and anxiety were "non-severe" and, in any event, the ALJ properly analyzed these impairments in formulating Plaintiff's RFC.

2.    Substantial evidence supports the ALJ's other RFC determinations

Plaintiff next argues that the ALJ erred by failing to account for limitations related to Plaintiff's cervical spine impairments, fibromyalgia, costochondritis, and irritable bowel syndrome in the RFC. (Pl.'s Br. at 17-20.) The Court disagrees and finds that substantial evidence supports the ALJ's determination that, notwithstanding these conditions, Plaintiff could perform a range of light and sedentary work.

Between steps three and four, the ALJ is required to assess all of the claimant's impairments - even ones that are not "severe" - in combination, when making the RFC determination. See 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity."). Again, as previously noted, the ALJ must apply SSR 96-8p, as quoted above.

Here, the ALJ considered all of Plaintiff's "severe" (R. at 21-29) and "non-severe" impairments (R. at 17-19), before finding that she possessed the RFC to perform "light work . . . to include the full range of sedentary work, except that she could only occasionally perform all postural activities." (R. at 21.) As the

ALJ explained with respect to Plaintiff's alleged fibromyalgia, costochondritis, and irritable bowel syndrome:

> Although [Plaintiff's] primary care records mention diagnoses of irritable bowel syndrome, costochondritis, and fibromyalgia, the basis of these conditions is not clear from the record. To the extent these could be considered impairments, the record is insufficient to determine severity, particularly prior to the date last insured.

(R. at 18.) The ALJ also fully accounted for Plaintiff's cervical spine impairments by finding those impairments to be "severe" at step two (R. at 17), considering and weighing the relevant medical evidence (R. at 21-31), and then limiting Plaintiff to light and sedentary work through the Date Last Insured. (R. at 21.) The Court finds that the ALJ fully considered all of Plaintiff's "severe" and "non-severe" impairments, including her cervical spine impairments, fibromyalgia, costochondritis, and irritable bowel syndrome, and reasonably determined that Plaintiff could perform sedentary work with the limitations set forth in the RFC. Accordingly, substantial evidence supports the ALJ's treatment of Plaintiff's impairments in the formulation of her RFC.

### 3. The ALJ did not err at step four

Third, Plaintiff contends that the ALJ erred by relying on a vocational expert's testimony at step four without asking the vocational expert whether an individual with Plaintiff's RFC could perform Plaintiff's past relevant work. (Pl.'s Br. 20-21.) The Court finds that the ALJ did not err by relying on the vocational

expert's description of Plaintiff's past work only and then independently determining that Plaintiff could perform her past work.

During Plaintiff's hearing before the ALJ, the vocational expert described Plaintiff's past work as a court clerk (DOT 243.362-010), which is classified as a sedentary and skilled position at the SVP-6 level. (R. at 66.) The ALJ chose not to ask the vocational expert any hypothetical questions, as is often but not always done in these hearings, including whether a person with Plaintiff's RFC could perform work as a court clerk. (R. at 61-66.) Having formulated Plaintiff's RFC as described above, the ALJ ultimately determined at step four that, consistent with her RFC, Plaintiff could perform past work as a court clerk and stated:

> In comparing [Plaintiff's] residual functional capacity with the physical and mental demands of this work, the undersigned finds that [Plaintiff] was able to perform it as actually and generally performed. The vocational expert's testimony is being relied upon in accordance with SSRP 00-4P.

(R. at 31.)

It is clear from the record that the ALJ relied on the vocational expert's description of Plaintiff's past work only and then the ALJ independently determined that Plaintiff could perform her past work. This is permitted by the Social Security regulations, which state, in relevant part, that an ALJ may, but is not required to, rely upon a vocational expert for various

purposes at step four. See 20 C.F.R. § 404.1560(b)(2) ("We **may** use the services of vocational experts . . . to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity. . . . In addition, a vocational expert or specialist **may** offer expert opinion in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work. . . .") (emphasis added); see also Banks v. Massanari, 258 F.3d 820, 827 (8th Cir. 2001) ("[V]ocational expert is not required at step four where the claimant retains the burden of proving she cannot perform her prior work."); Breslin v. Comm'r of Soc. Sec., 2014 WL 936441, at *14 (D.N.J. Mar. 10, 2014) ("When the ALJ finds the claimant is able to perform past relevant work, [no] source[] require[s] an ALJ to consult a vocational expert at step four, regardless of the nature of the claimant's impairments."). Thus, the ALJ did not err at step four.

4.   The ALJ assigned appropriate weight to the medical opinions of record

Finally, Plaintiff argues that the ALJ erred in selectively rejecting the opinions of certain medical sources when crafting Plaintiff's RFC. (Pl.'s Br. at 21-25.) Specifically, Plaintiff argues that the ALJ improperly weighted the 2014 Medical Source Statement of Dr. Maressa and failed to assign any weight at all to

the August 2015 examination of Dr. Knod. (Id.) For the reasons described below, the Court finds that substantial evidence supports the ALJ's treatment of these medical opinions.

"[T]he ALJ — not treating or examining physicians or State agency consultants — must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361; see also 20 C.F.R §§ 404.1527(e)(1). The ALJ is entitled to weigh all the evidence in making his or her finding. Brown v. Astrue, 649 F.3d 193, 196 (3d Cir. 2011). It is established that, "[a]lthough treating and examining physician opinions often deserve more weight . . . [t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." Chandler, 667 F.3d at 361 (citing Brown, 649 F.3d at 197 n.2). Where inconsistency in evidence exists, the ALJ retains significant discretion in deciding whom to credit. Plummer, 186 F.3d at 429. However, the ALJ "cannot reject evidence for no reason or for the wrong reason." Id. (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)); see also Cotter, 642 F.2d at 704-05.

The ALJ assigned "little weight" to Dr. Maressa's June 2014 Medical Source Statement that Plaintiff had been severely limited since her alleged onset date. (R. at 30.) In the Medical Source Statement, which was completed several months after Plaintiff's Date Last Insured, Dr. Maressa opined, among other things, that Plaintiff could only walk one to three city blocks without rest or

severe pain, could sit for less than two hours in an eight-hour workday, could stand/walk for up to one hour in an eight-hour workday, and that Plaintiff's impairments would cause her to be off task at least 25% of the workday. (R. at 426, 428.)

The ALJ fully explained his reasons for discounting Dr. Maressa's June 2014 opinions (R. at 30), and substantial evidence supports his decision to do so. For example, Dr. Maressa's treating notes between July 2011 and May 2012 revealed normal findings (R. at 294-95, 302, 312), and contemporaneous records (including Dr. Maressa's own treatment notes) indicate that Plaintiff's pain and symptoms related to her arm, shoulder, back, and hip had been successfully treated with physical therapy. (R. at 387). Perhaps most importantly, Plaintiff stopped working in November 2008 due to her early retirement, not any of the impairments which she allegedly first experienced two years later. Notwithstanding Plaintiff's 2015 claim that she intended to return to work in 2011 (R. at 439), there is scarce record evidence that Plaintiff ever actually attempted to return to the workforce on a full-time basis prior to the Date Last Insured. For these reasons, substantial evidence supports the ALJ's decision to discount Dr. Maressa's June 2014 Medical Source Statement.

With respect to Dr. Knod, the ALJ discussed his August 2015 examination of Plaintiff but did not explicitly assign any weight to his findings or opinions. (R. at 27-28.) In the August 2015

examination, Dr. Knod noted that Plaintiff stated her pain was aggravated by standing in position for up to a half hour, any bending, walking farther than one block, lifting greater than six pounds, and squatting, and further noted that her physical therapy merely "calms it." (R. at 438.) Ultimately, Dr. Knod opined that Plaintiff's "multitude of problems," taken individually or separately, would limit her ability to work in a competitive environment on a regular, full-time basis. (R. at 444.)

The Court agrees with Plaintiff that "[t]he ALJ devotes significant space in the decision analyzing the [August 2015 examination] of Dr. Knod, but then fails to assign it any weight." (Pl.'s Br. at 23.) But the Court finds that the ALJ's assignment of no weight to Dr. Knod's report is well-reasoned upon the record; Dr. Knod's findings in the one-time examination completed 20 months after the Date Last Insured are not relevant to the disability determination concerning November 2010 through December 31, 2013, where contemporaneous records prior to December 31, 2013 do not support any severe impairment. See DeNafo, 436 F.2d at 739; Manzo, 784 F. Supp. at 1156. Accordingly, the Court will not remand on this basis. See Rutherford, 399 F.3d at 553 (remand not required "because it would not affect the outcome of the case").

## V. CONCLUSION

For the foregoing reasons, the ALJ's well-reasoned and thorough decision will be affirmed. An accompanying order will be entered.

**2/25/2019**                          **s/ Jerome B. Simandle**
Date                                    JEROME B. SIMANDLE
                                        U.S. District Judge